IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 13-01164-TUC-CKJ (LAB) |
| Plaintiff, | ) ) | **REPORT AND RECOMMENDATION** |
| vs. | ) ) ) | |
| Albert Michael Campas, | ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) | |

The District Court referred this case to the Magistrate Judge for a hearing on the defendant's motion to suppress statements. (Doc. 48)  The defendant, Albert Michael Campas, argues that his post-arrest statements must be suppressed because they were taken in violation of *Miranda* and were coerced and involuntary, in violation of the Fifth Amendment to the United States Constitution.

An evidentiary hearing was held on May 20 and 21, 2014.  United States Border Patrol (USBP) Agent Jarmon was released without testifying after the parties agreed that Campas was in custody when he gave his statements and he made no statements to Agent Jarmon. Drug Enforcement Agency (DEA) Special Agent (SA) Michael Garbo, United States Border Patrol (USBP) Agent Elvis Medina, DEA Agent Jay Gospodarek, South Tucson Police Department (STPD) Officer Frank Moreno, DEA Agent William Kimbell, and USBP Agent Jorge de la Garza testified on May 20, 2014.  Exhibits 2, 6 and 7 were referred to by witnesses during testimony but were not admitted into evidence.

**Charge:**

   The defendant is charged in a one count indictment with possession with intent to distribute 100 kilograms or more, but less than 1,000 kilograms of marijuana, in violation of Title 21 United States Code §§ 841(a)(1) and 841(b)(1)(B)(vii). (Doc. 5).

**Motion to Suppress:**

   The defendant, Albert Michael Campas, argues his Fifth Amendment rights were violated because during a custodial interrogation he was not adequately advised of his *Miranda* rights. He states that he only gave incriminating statements after the agents acted in a threatening manner and made promises.   Therefore, his statements were involuntary and must be suppressed.

   The Court concludes the statements were given after proper *Miranda* warnings and a voluntary waiver. The incriminating statements were given after DEA Agent Kimbell stood, yelled and used profanity. The statements were voluntary and are admissible at trial.

**EVIDENCE:**

***Michael Garbo***

   Michael Garbo testified that he is the case agent and a DEA Special Agent.  He has worked for the DEA since 2005.  Garbo was assigned as the case agent on 5/22/13, the day after Campas was arrested at the I-19 Border Patrol checkpoint and gave his statement to other agents.  Garbo's report in this case is based on Agent Kimbell's field notes, Agent Jarmon's I-44 report, and from talking to other agents.  Agent de la Garza also took notes but Garbo does not know where they are.

   Garbo named six agents in his report who were either at the checkpoint, in the interrogation or in the DEA building working on the investigation. He testified that Agents Kimbell, Moreno and de la Garza conducted the interview.  There are no recording devices in the three DEA interview rooms.  DEA policy is that interrogations must be memorialized in either written or recorded form.  There is not always a recorder available although agents have smart phones with recording capabilities.  There must be at least two agents present during questioning of suspects.  DEA policy also dictates that notes should

1  be taken and kept safely in the case file or some safe area.

2  ***Elvis Medina***

3  Elvis Medina testified that he has been a USBP agent since 2005 and is assigned to the

4  DEA task force.  On 5/21/13 he was assigned to help with a seizure of a FedEx truck at the

5  I-19 checkpoint.  When Medina arrived at DEA headquarters he saw the defendant in an

6  interview room with the door open.  He did not go into the interview room and did not ask

7  the defendant any questions.  He asked one of the interrogating agents if there was a video

8  showing where the defendant picked up the load of marijuana, but the agent said there was

9  not.  Medina helped unload the marijuana bundles and tried to get the fingerprint machine

10  at DEA headquarters to work.  He did not write a report or take notes.

11  Medina has made over 100 arrests.  He records interviews when possible.  Border Patrol

12  agents audio and video record all interviews.

13  Medina and Gospodarek were walking around the booking room at DEA headquarters.

14  Medina heard some of the defendant's interview because  the door was open.  The interview

15  room accommodates four big chairs.  Medina heard Kimbell raise his voice and say

16  something about the defendant needing to tell the truth.  Kimbell was yelling and challenging

17  the defendant.  Medina did not hear anyone tell the defendant that he would spend the night

18  in jail with Bubba.  He did not hear anyone tell the defendant that he would not see his young

19  daughters until they are adults.

20  ***Jay Gospodarek***

21  Jay Gospodarek has been a DEA agent since 2002.  He testified that he was called to the

22  checkpoint, where Campas was arrested, to assist in a support role.  He followed the load of

23  marijuana from the checkpoint to Tucson and he tried to help fix the fingerprint machine at

24  DEA headquarters.

25  Gospodarek did not write a report or take notes.  He was in the booking room adjacent to

26  the interview room, walking back and forth, getting paperwork.  He did not go in the

27  interview room, ask any questions of the defendant, or hear any specifics of the interrogation,

28  although the interview room door was open.  The room is about 7' by 7' with a table and

1   chairs and no recording device built in.  The room is not too small for four people.

2   Gospodarek heard Agent Kimbell raise his voice during the middle or second half of the

3   interview.  Kimbell was irritated.  Gospodarek heard no other agent raise his voice.  Campas

4   had been in custody for about four hours before the interrogation began.

5       Members of the DEA task force must comply with DEA policies.  There is no requirement

6   that an interview be recorded, but notes should be taken.  The notes are usually kept in the

7   case file.  Some agents have recorders.  Usually only one person writes a report.

8   ### ***Frank Moreno***

9       Frank Moreno is a detective and a canine handler with the South Tucson Police

10   Department.  On 5/21/13 Moreno was working for the Marana Police Department on the

11   DEA task force, investigating drug and currency trafficking.  He testified that he was called

12   to respond to the I-19 checkpoint at about 4:00 pm or 5:00 pm.  When he arrived he saw a

13   FedEx truck in secondary inspection with boxes next to the truck.  He spoke with a USBP

14   agent and then went inside where he saw the defendant.

15       Moreno had been working at FedEx on bulk cash interdiction.  He knew Campas, the

16   driver who was detained, because they saw each other daily at FedEx, and had some

17   conversations.  Moreno was assigned to interview Campas.  When a USBP agent opened the

18   holding cell door, Campas said that he had been set up, was just the driver, and didn't know

19   anything.  Moreno stopped Campas because Campas was in custody and had not yet been

20   advised of his rights.  He told Campas he would talk to him later.

21       The interview took place in an interview room at the DEA office.  The room is about 5'

22   by 8' with a table and chairs.  Campas sat on one side of the table.  Kimbell sat to his left at

23   the end of the table.  Moreno sat across the table from Campas, and de la Garza sat next to

24   Moreno.  Moreno had secured his weapon in his car.  There were no weapons visible during

25   the interrogation.  Moreno was the lead interviewer.

26       De la Garza and Kimbell took notes.  A typical DEA interview room does not have a

27   recorder.  The interview was not recorded.  There is no requirement that interviews be

28   recorded, and that is not standard procedure.  Notes are sufficient. They should be secured

in the case file.  Marana Police Department requires recording or notes.  South Tucson Police Department records interviews.

The interview took place in English because Campas is an English speaker.  Moreno read Campas his rights from a DEA *Miranda* form.  Campas said he understood his rights and agreed to waive them and make a statement.  He did not sign a written waiver form.  No threats or promises were made.  Campas was anxious, fidgety, and concerned but not frightened.  On cross-examination, Moreno testified that Campas was scared, fidgety and anxious.

During the interrogation Moreno asked Campas if he knew why he was arrested at the checkpoint.  Campas said that he was just a driver and had been set up.  He said he had no knowledge of the marijuana and that although the parcels were suspicious, it is against FedEx policy to inquire about suspicious parcels.  He said drivers are not permitted to contact the authorities because there were prior threats to other drivers from drug traffickers.  Moreno is familiar with FedEx policies.  Drivers are to use common sense and contact authorities when they have suspicions.  During the interrogation, the discussion about FedEx policy lasted for about 10 minutes.

Moreno and Kimbell were rolling their eyes and shaking their heads during Campas' statement.  Kimbell stood up and said he was done listening to untruthfulness and if that continued he would end the interview.  Kimbell did not say that if the interview ended Campas would go to jail but that's what the agents understood.  Kimbell was yelling loudly and using profanity.  He yelled for about a minute.  Kimbell is about 6' tall and weighs about 230 pounds.  Kimbell told Campas he could go to prison but did not say for how long.  After Kimbell's outburst, Campas looked defeated, stared at the table and was no longer fidgety.

Campas then explained that he was approached by a FedEx employee, Ben Soto, in Nogales several months before.  On 10 prior occasions, Campas was paid to transport boxes.  Campas drove to Nogales and saw "Pariente".  He saw a minivan arrive.  Campas went to Mexico to gamble or to workout, or he would go have lunch.  Campas did not handle the boxes.  He just drove.  He noticed the boxes had fictitious labels.  The agents asked few

1    questions. Primarily Campas spoke freely for about 20 minutes after Kimbell yelled at him.

2    Campas was not frightened.   There were no physical threats, no threats of continued

3    detention, and no promises made.

4         When the interrogation ended, Moreno gave Campas a ride to a location where Campas'

5    friend met him and drove him away.  Campas was not detained.  The agents wanted to pursue

6    the drug trafficking organization and they thought Campas would help.  Campas allowed the

7    agents to search his phone.

8         Moreno did not write a report.  He reviewed the DEA report written by de la Garza.  He

9    met with the prosecutor regarding the motion hearing the day before the hearing and about

10   a month ago.

11   ***William Kimbell***

12        William Kimbell has been a DEA agent for 12 years.  He testified that he was not at the

13   I-19 checkpoint on 5/21/13, the day the FedEx truck was stopped.  He first participated in

14   this case at DEA headquarters in the prisoner processing area.  Kimbell saw the boxes of

15   marijuana and was familiar with the facts of the seizure before the interrogation began.

16        Campas was arrested at about 4:15 pm and the interview began after 8:30 pm.  The

17   interrogation took place in an interview room measuring approximately 7' by 7' with a 3' long

18   desk that had chairs all around it.  It is normal to have three agents present during an

19   interview.  DEA policy requires the presence of at least two agents.  Kimbell was standing

20   in the doorway as the interview started.  He chose to join the interrogation because Agent de

21   la Garza is less experienced.  Kimbell witnessed Moreno read Campas his rights and heard

22   Campas acknowledge them and agree to speak.  Kimbell did not write a report.  He took

23   notes.  Agent de la Garza also took notes, but he destroyed them.  It is DEA policy to

24   preserve notes.  The interview was not recorded.

25        Campas was brazen, leaning back against the wall, facing the doorway, sometimes facing

26   the agents during questioning.  For the first 20 minutes Campas said he knew nothing.  He

27   said he didn't load the truck and was just a driver.  Campas had a gym bag that contained

28   $500 cash and bottles of vicodin.  He was first asked some biographical information.

1   Campas stated that he lived with his mother and was getting divorced.

2       After about 20 minutes of questions Kimbell took over the interview because they were
3   not getting anywhere.  Moreno was hesitant to ask direct questions.  When Campas denied
4   knowledge but admitted that he noticed the boxes were suspicious, Kimbell asked Campas
5   why he transported the suspicious boxes and did not tell FedEx management.  Campas said
6   that it was against company policy to question suspicious parcels because there had been
7   prior threats from drug trafficking organizations.  Kimbell spoke with FedEx security
8   personnel in Phoenix and was advised that drivers must check their cargo to be sure they are
9   not transporting hazardous cargo.

10      Kimbell told Campas that he was going to be charged with transporting marijuana and it
11  was in his best interest to help with the investigation so he could get some consideration.
12  Kimbell said Campas was going to jail if he didn't cooperate.  If he cooperated, Campas
13  would go home that night.  There were nothing said about future prosecution, and Campas
14  was told the agents couldn't make any promises.  Kimbell stated multiple times that he told
15  Campas he would be charged.  On cross-examination Kimbell testified that he told Campas
16  that he was going to be charged unless he cooperated.

17      Kimbell is taller than Campas.  Kimbell yelled at Campas that the facts did not make
18  sense, and used profanity, for about five minutes, but not continuously.  Kimbell stood while
19  he was yelling.  He is 6'1" tall and weighs 220 pounds.  He was not in Campas' face, made
20  no threats and used no violence.   Kimbell promised Campas he could go home if he
21  cooperated but there were no promises made regarding the case.  He told Campas he would
22  be charged and to think about his family.  He did not say that Campas would not see his
23  daughters until they were adults and did not say that Campas would spend the night in a jail
24  cell if he did not cooperate.

25      Campas was scared but not of Kimbell.  He was scared because he was going through a
26  life-changing event by being arrested for drug trafficking.  Campas was in good physical
27  health and showed no signs of mental problems.  He was not given any bathroom breaks,
28  food or water, but he did not ask for that.

1    After Kimbell yelled, Campas' demeanor changed.  He had been looking at the floor, was

2    nervous and leaning over.  Once Campas started confessing, he spoke easily and without

3    hesitation.  Campas explained that two months earlier he had been approached by his co-

4    worker, Ben Soto, the manager of the FedEx Nogales warehouse.  Soto asked Campas to

5    transport some boxes.  Campas wasn't sure at first, but he thought the boxes contained drugs

6    and he needed the money to pay for his divorce attorney.  Campas admitted making ten trips

7    for Soto between Nogales and Tucson in the FedEx truck in the prior two months.  He was

8    paid $400 per trip.  Campas provided additional information and was especially detailed

9    about the Nogales operation.  Campas said this shipment was bigger than the prior loads.

10    Kimbell had Campas go through the details of his confession twice, which he always does

11    to assure accuracy.

12    The interview lasted for about an hour.  By the end of the interview, Campas looked

13    defeated.  Kimbell decided to let Campas go home after the interview because Campas

14    cooperated, and Kimbell hoped for more cooperation.  Campas was driven to Walgreens to

15    get a ride home.  Kimbell testified that he would have let Campas go home even if he

16    continued to deny knowledge.  He would have asked for a summons to bring Campas into

17    court, although he has never done that before in a case of this nature.

18    ***Jorge de la Garza***

19    Jorge de la Garza testified that he has been a USBP agent for 7 ½ years.  He was on the

20    DEA Task Force until 9/13, including on 5/21/13 when the defendant was arrested.  In

21    preparation for the motion hearing, de la Garza reviewed his DEA report, which he found to

22    be accurate.  De la Garza took notes during the interview but he destroyed them because his

23    notes were incorporated into his report.  On direct-examination by defense counsel, de la

24    Garza acknowledged that he wrote details of Campas' statement in his notes but those are

25    not included in his report.  De la Garza is not sure if policy requires the notes to be preserved.

26    At about 4:30 pm, de la Garza was called to respond to the checkpoint to assist with a drug

27    seizure.  He helped unload and x-ray some boxes.  He can't remember if he had contact with

28    Campas at the checkpoint.  The interview at the DEA office in Tucson began at 8:38 pm,

over four hours after Campas' arrest.  It lasted about an hour and was not recorded. It took place in a 7' by 7' interview room with Agents Moreno, Kimbell and de la Garza present. Moreno asked questions first.  Campas denied knowledge of the marijuana.

Kimbell then took over the questioning, standing up and yelling briefly at Campas, saying he did not believe him. De la Garza doesn't remember if Kimbell used profanity but he may have.  De la Garza also doesn't remember if Kimbell said he would end the interview and Campas would go to jail, or if he said that if Campas cooperated he would go home.  De la Garza testified that those statements would not make sense because it is the Assistant United States Attorney who would make that decision.

During the interview Campas was sitting back in his chair.  He was fine.  He did not look nervous or scared.  No threats or promises were made.  There was no intimidation.  No weapons were visible.  The worst that occurred during the interrogation was yelling.

**DISCUSSION**:

**Miranda**:

Statements that are made in response to questioning initiated by law enforcement officers while a person is in custody may not be used in the government's case-in-chief unless the person is first advised of his *Miranda* rights.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). An incriminating statement obtained during a custodial interrogation is only admissible if there has been a knowing, intelligent, and voluntary waiver of *Miranda* rights.  *Id*.  The courts look at the totality of the circumstances to determine if a *Miranda* waiver is voluntary, knowing, and intelligent. *U.S. v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citations omitted).

The government stipulated that Campas was in custody when his statements were made. The defense conceded that proper *Miranda* warnings were administered and waived by the defendant before questioning began at DEA headquarters.  Campas' statement to Moreno at the checkpoint was made spontaneously and was exculpatory.  Moreno stopped him from speaking further.

Based on the totality of the circumstances, for purposes of *Miranda*, the Court finds that

1   the statements are admissible at trial.

2   **Voluntariness**:

3   Even when *Miranda* warnings are given, the government must establish that the

4   challenged statements were made voluntarily. *Arizona v. Fulminante.*, 499 U.S. 279, 278

5   (1991).   In making that determination, the Court must consider "the totality of the

6   circumstances." *Id.* at 285.   It is the rare case where a defendant received *Miranda* warnings

7   and can still make a colorable argument that his inculpatory statement was compelled.

8   *Dickerson v. U.S.*, 530 U.S. 428, 444 (2000) *citing Berkemer v. McCarty*, 468 U.S. 420

9   (1984).

10   Courts have held that raised voices, yelling by armed interrogators, and yelling and calling

11   the suspect a liar, did not render a statement involuntary. *Jenner v.* Smith, 982 F.2d 329, 334

12   (8th Cir. 1993) (citations omitted); *U.S. v. Dehghani*, 550 F.3d 716, 720 (8th Cir. 2008); U.S.

13   *v. Jones*, 359 F.3d 921, 923 (7th Cir. 2004); *U.S. v. Santos*, 131 F.3d 16, 18 (1st Cir. 1997).

14   The factors Courts considered in finding statements voluntary included that the interrogations

15   lasted one hour or 90 minutes.   The suspects were informed of their rights.   No physical

16   violence was used.   The suspects were not handcuffed.   Although the suspect never asked,

17   he was not deprived of beverages, phone calls or access to a restroom.   Even where the

18   suspect appeared nervous he had no problem answering questions.

19   When agents promise to inform the prosecutor of cooperation and not to arrest and charge

20   a defendant on that day, those promises are "not sufficiently critical to render the confession

21   involuntary" even if the latter promise is broken. *U.S. v. Shears*,  762 F.2d 397, 402 n. 4 (4th

22   Cir. 1985), citing *U.S. v. Robinson*, 698 F.3d 448, 455 (D.C. Cir. 1983); *U.S. v. Glasgow*, 451

23   F.3d 558 (9th Cir. 1971) (statements not involuntary where agents promise to advise AUSA

24   of defendant's cooperation.).   It does not matter if the suspect confessed because of a promise

25   as long as the promise did not overbear his will. *See Hutto v. Ross*, 429 U.S. 28, 30 (1976).

26   The analysis must still be made using the totality of the circumstances test.

27   In the present case, Campas was interrogated about four hours after he was arrested.   The

28   questioning took place in a 7' by 7' interview room with a table and four chairs.   The door

was open and other agents were in the area.  Campas was not handcuffed.  Three agents were in the interview room; none had a weapon visible.  Campas was read his *Miranda* warnings before questioning began.  He said he understood his rights and agreed to speak with the agents without an attorney.  He did not sign a written waiver.  The interrogation was not audio or video recorded.  The interview was conducted in English since Campas is an English speaker.  The interview lasted about one hour.  Campas was scared, fidgety and anxious.  He knew Agent Moreno from FedEx where Campas worked as a truck driver, and Moreno regularly worked on bulk cash interdiction.  Campas appeared to be in good physical health and showed no signs of mental impairment.

During the first 20 minutes of the interview the agents rolled their eyes and shook their heads to show that they thought Campas was lying.  Then Agent Kimbell, who is 6'1" tall and weighs 220 pounds, stood and yelled for one to five minutes intermittently, using profanity, and telling Campas that if he wasn't willing to tell the truth the interview would be terminated.  Kimbell kept his distance and did not move closer to Campas.  Campas was told that if he gave truthful information he would not be arrested that night, although he would still be charged.  Campas' demeanor changed .  He looked defeated.  He began providing information with minimal questioning.  He spoke freely and without hesitation. No threats were made.

Campas argues that his statements should be suppressed because they were involuntary and his will was overborne, in violation of his Due Process rights.  The argument is based on Agent Kimbell standing, yelling and swearing at Campas during the interrogation and Kimbell's promise that if Campas provided truthful information he would not be detained that night.

Based on the totality of the circumstances, the Court finds that Campas's statements were freely and voluntarily given.  They were not extracted by threats, violence, or express or implied promises sufficient to overbear his will or critically impair his capacity for self-determination.

**RECOMMENDATION:**

1      In view of the foregoing, it is recommended that, after its independent review of the

2   record, the District Court **DENY** the motion to suppress statements. (Doc. 48).

3      Defense counsel may serve and file written objections within 14 days.  If objections are

4   not timely filed, the party's right to de novo review may be waived.  No reply to objections

5   shall be filed unless leave is granted from the District Court.

6      The Clerk of the Court is directed to send a copy of this Report and Recommendation to

7   all parties.

8      DATED this 3rd day of June, 2014.

9

10   .

11

12

13

                                Leslie A. Bowman
United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28